## SHACK CALDWELL *v.* THE STATE.

1. EVIDENCE — DYING DECLARATIONS — PRACTICE.— Objection to the reception in evidence of the dying declarations of the deceased comes too late when made for the first time in motion for new trial.

2. ORGANIZATION OF PETIT JURY — PRACTICE.— The Code of Criminal Procedure requires that in capital cases each juror shall be tried and passed upon separately, and that as each juror is selected for the trial of the case the statutory oath shall be administered to him by the court or under its direction. Objection that this was not done, but that, after the twelve had been selected, the oath was administered to them in a body, comes too late when made for the first time in the motion for new trial, and this court will not reverse for such an irregularity when proper objection was not made at the proper time. See the opinion *in extenso* on the question, and for authorities discussed.

3. NEW TRIAL — PRACTICE.— M. was separately indicted for this same offense, but a *nolle prosequi* was entered as to him after the conviction of the appellant. Appellant, in his motion for new trial, relied upon the affidavit of M. to the effect that, about, twenty or thirty minutes after the shooting, the appellant said that he had broken the law, but would not have done so if the deceased had not cut at him with a knife. *Held*, that the facts immediately attending the

killing are not of such character as would make this statement of the appellant competent evidence, and, further, that no probability of the truth of such statement is apparent.

4. EVIDENCE.— See evidence held sufficient to sustain a capital conviction for murder in the first degree.

APPEAL from the District Court of Collin.    Tried below before the Hon. J. BLEDSOE.

The indictment was for murder and charged the appellant with shooting W. R. Norval, on the 16th day of October, 1881, in Collin county, Texas, from which shooting Norval died on the 24th day of the same month.    His trial resulted in a conviction of murder in the first degree, the death penalty being assessed.

Dr. A. Sims was the first witness introduced on behalf of the State.    He testified that, as a practicing physician, he attended the deceased at the time of his death, which was caused by a gun-shot wound, the ball entering the abdomen about one and a half inches below the breast bone, and about three-fourths of an inch to the right of the middle of the abdomen.    The ball did not pass through the body.    He could not tell whether the wound was made with a buck-shot or a pistol ball.    He first saw the deceased after he was wounded on Sunday evening, October 16, 1881, after dark and a few hours after he was shot.    The deceased lived about one week.

The witness, with Doctor Gibson, made a post-mortem examination, and discovered that the bullet passed through the abdominal wall, through a portion of the liver, and through the stomach.    The deceased lived about three and a half miles from McKinney, Collin county, Texas, and appeared to be sane.    On the night that the witness first visited him after the wounding, the deceased appeared very much alarmed, and said that he thought he was going to die.    He made a statement in reference to the shooting, in reply to interrogatories propounded by the witness for the purpose of ascertaining the relative

positions of the parties at the time of the shooting. At the time he made the statement, the deceased was lying on a bed in the east end of the room. There was a chimney in the west end, and a door about half way or middle of the wall. He had the witness to place a chair near the door, and between it and the fire-place where, he said, he was sitting when he first saw the defendant come up. He said that he jumped up, or started to get up, when the defendant fired, but that he did not know whether he had reached an erect position or was in the act of rising when he was shot. The witness thought that deceased told him in this conversation that nothing was said by either him or the defendant before the shot was fired.

The witness stated on cross-examination that the deceased had him to place the chair about three or four feet from the hearth, rather back against the wall, and three or four feet from the door. He said nothing to the witness about whittling at the time, nor did the witness see a knife. The deceased told him that the defendant ran, immediately after the shooting. Patterson, Mallow, Mrs. Sauer, and some colored women were present when this statement was made. The deceased did not think he was going to recover. The witness saw him again next morning, with Dr. Gibson, who conversed with him for the purpose of obtaining the same information. The deceased mentioned several times during his sickness that he believed he was going to die, but the witness, from his previous knowledge of his contrary nature, did not put much reliance in it, and told him once that if he, witness, were to tell him he was going to die, he would claim that he would recover. The witness examined the deceased's coat, and found a bullet hole and blood, but no powder burn. The door spoken of was on the south side of the room and there was a room west.

Re-examined the witness said that he told the deceased that he was not going to die, to encourage him. The de-

ceased was a contrary, contentious man, and wanted to differ and argue with one.

Dr. J. E. Gibson testified for the State that he saw the deceased first on Monday morning, in company with Dr. Sims, and thereafter once a day until death ensued. He appeared sane at all times. The witness did not think that the deceased apprehended death when he first saw him, but on Tuesday morning he complained of not feeling so well, and expressed a belief that he would not recover. He then made some statements in addition to those he had previously made, and made them without persuasion. The witness asked him the relative positions of the parties, and he spoke of his being seated between the fireplace and the door; of the party who did the shooting coming up, and some conversation taking place between them. He said that the defendant was near the door outside of the house, and he seated between the fire-place and door on the inside; that he saw that the party was going to shoot, and he started to get up, when the party fired. Two or three of deceased's children were present on the morning of the witness's first visit.

Cross-examined the witness stated that on Monday morning the deceased expressed himself as feeling better, but that on Tuesday he complained of being worse and said that he would not get well. His wounds were being dressed at this time, and he was asked about the position of the parties, when the deceased described it as above. The witness did not know, but thought there was a step on the outside of the door. If the parties were both standing erect, and on a level, the ball would have taken the course it did, but if the deceased was stooping towards the party shooting, and the pistol was held on a level with the point of entrance, the shot would have wounded structures lower down, according as the position varied. The witness thought, from the course of the ball, that the deceased was slightly stooped when shot. He had heard

the deceased make statements other than those detailed.

Re-examined, the witness stated that respiration would not have affected the course of the ball. The tendency of the ball was a little downwards. He thought that on Tuesday morning the deceased alluded to the position of the parties, but he then made no statement about the conversation between himself and the defendant.

Dr. Sims, recalled by the State, testified that there is no rule governing the course which a ball will take after entering the body. At the place where the wound was in this case, respiration would affect the position of the liver and other organs. The deceased said that he was in the act of rising from the chair when the shot was fired. The house is raised twelve or fifteen inches from the ground, and a block on the outside is used for a step.

Cross-examined, the witness stated that breathing would vary the positions of the organs in the body one and a half inches. He saw no deflection in the wound. If the parties had been on a level when the shot was fired, and the deceased in a stooping posture, the ball would have ranged lower down. According to the witness's recollection, there was no conversation said to have taken place between the deceased and the defendant before the shot was fired.

Here the defendant's counsel read from the testimony of the witness on the preliminary examination, as follows: "I recollect distinctly that deceased said that there was no conversation between himself and defendant before the shot was fired." The witness answered: "My recollection of the matter was fresh at the time of the examining trial, and the above statement made by me then was correct."

Henry Patterson testified for the State that he lived about three-quarters of a mile from the deceased, had known him for eight years, and saw him a little after

sundown on the Sunday evening he was shot. He was then on his bed, in a bloody shirt, with a wound in the stomach. Mallow, Grigsby, Caves and others were present. The deceased appeared sane, and made a statement about the shooting. He said: "I think I am a dead man." The witness asked him how he came to be in that fix. He said that the defendant came to the door and said. "Good morning," and that he replied "Good morning;" that the defendant then said "I have come after that money;" that he replied: "I do not owe you any money." That the defendant then said: "If you do not pay me, I will shoot your d—d old brains out;" that he replied: "Go away, Shack, you are a fool," whereupon the defendant fired. He stated that the defendant was outside and east from the door, and that he was inside and west from the door. He stated that as soon as the shot was fired, he (the deceased) ran out of the house, and called for a negro who lived near there, and then passed back through the house to the north side, and around the house to the southeast, where he sat down in a chair and called Martha, the defendant's mother.

This witness stated, on cross-examination, that the deceased said that the defendant asked him for three dollars and something, which money was claimed by the defendant for building a house; that the reason he had not paid the defendant was because he had let some ground which he had rented from the deceased grow up in weeds. He said that he had told the defendant that he was willing to submit the controversy to the settlement of three disinterested men. The witness stated that though he thought the deceased a peculiar man, he did not think him contrary or contentious, but that he was a man who would do right by others, and who wanted his own rights.

Lillian Norval, a child about ten years old, was introduced by the State, and upon examination by the court was held incompetent to testify, because of mental inca-

pacity, but was subsequently introduced and testified in substance, as follows: "Shack shot my father. My father was sitting down in the house. Shack first told him 'howdy,' and my father said 'howdy.' Shack said he wanted three dollars. My father said he didn't owe him. My father went out of doors when he was shot, and sat down in a chair. I have two brothers younger than myself. They were in the house. Shack shot once. He went out at the gate after he shot. He rode a horse there. Father was getting up when the shot fired."

On cross-examination she said: "I was standing near the door that leads into the kitchen, near the fire-place. Father had nothing in his hands. He was leaning back against the wall. Shack said nothing more after father told him he didn't owe him. Father then started to get up. He didn't tell Shack to go away, he was a fool. Didn't ask him 'what money?' I ran out at the kitchen door when the shot was fired. Father went out of the house. He had not been whittling and had no knife in his hands. Aunt Martha was the first person who got there. My father was sitting in a chair. Somebody told me to-day that I would go to the bad house if I told a story. Don't know what they meant. Shack had a pistol in his hand when I first saw him. Father was not reading a newspaper,— he had no newspaper in his hand."

O. P. Mallow testified for the State that he lived within a few hundred yards of the deceased and had known him for eleven or twelve years. He saw him late on the Sunday evening on which he was shot. When the witness reached the house, the deceased was standing by the bed, and the defendant's mother, Aunt Martha, was standing by his side. He was shot in the stomach below the breast-bone. The witness saw Chandler there a few minutes afterwards. He also saw the deceased's three children, Lillian among the number, and a young man named Townsend. The witness sent the defendant's

brother after the doctor.   The first thing the deceased said, after the witness got there, was: "I am a dead man."   Witness asked him: "What does all of this mean?"   He answered: "This negro Shack came here this evening and shot me."   He died the Monday week after the shooting.

Cross-examined the witness stated that the house is not over ten inches from the ground.   He thought the deceased had been in bed before he got there.   He did not regard the deceased as a contrary, though a rather "singular" man.   The witness knew nothing of deceased's indebtedness to the defendant.   On re-examination he said that the deceased stayed close at home, and attended to his own business.

P. P. Allen, for the State, testified that he had known the deceased since 1873, and stayed with him during the second and third nights after he was shot, and thought him sane.   The deceased said that he was going to die, that he did not expect to get well, and thereupon made a statement in answer to questions put by the witness as to how it occurred.   He said that he was sitting inside of the house, and had the witness to occupy a chair and lean back.   This position he said he occupied, reading a newspaper, when the defendant came up and demanded three dollars, which he said the deceased owed him.   That he told the defendant that he did not consider that he owed him anything, and was willing to leave the matter to three disinterested persons.   The witness could not remember whether the deceased said that the defendant made any reply, but he stated that he saw the defendant drawing a pistol, and stooped over and started to get up, when the defendant shot.   He said nothing about going out of the house.

John Hackett testified for the State that he sat up with the deceased on the Tuesday night after he was shot.   He appeared sane and made a statement about the shooting,

remarking, as the witness entered the house, "I am as good as a dead man." The witness asked him how it happened that he was wounded, and he replied that he was sitting in the southwest corner of the room, between the fire-place and the south door, and west from the door. That he did not know that any one was about until he saw the defendant approaching the door with a pistol in his hand. That the defendant said he had come after the three dollars the deceased owed him, and as the latter started to get up from the chair, the defendant fired.

Cross-examined, the witness stated that the deceased told him that the defendant said: "I've come after that money, and if you don't pay me, I'm going to kill you." He said nothing about leaning back and reading a newspaper, nor about having himself said anything to the defendant. He said that after he was shot he went into the yard and sat down.

Frank House, colored, testified for the State that he saw the defendant about 3 o'clock P. M. on the Sunday of the shooting. Witness ate dinner at his own home on that day, and went from there to the house of the defendant's mother. Shortly after he reached there, the defendant arrived. From the house he went to the lot with Babe, the defendant's brother, and Jim Mayberry. The defendant did not go with them. The defendant left his mother's house before the witness, going west, through the field, in the direction of the house of the deceased, which was about one quarter of a mile distant. The witness saw the defendant have a revolver pistol in his hand that day, in his mother's house. He heard no pistol or gun fire that evening, but did hear screaming at the deceased's house, and went to the house. Babe was there but the defendant was not. The latter was riding when he left. Babe went for a doctor.

Jack Lewis testified for the State that on the day of the killing, near sundown, he met the defendant going

north beyond East Fork, at a point from which the house of the deceased bears north of west, about three quarters of a mile. He was riding in a lope, and was accompanied by Jim Mayberry. There was a road from the deceased's house leading into the road they were traveling, but they were south of where it entered when the witness met them.

Wm. Warden, sheriff of Collin county, testified for the State that, failing to find the defendant in this State, he effected his arrest in Henry county, Missouri, about 550 miles by rail from McKinney, Texas, the way he went. He returned with him to McKinney, arriving about the 29th or 30th of October, 1881.

Abe Wilson, for the State, testified that he met the defendant at church on the day of the killing, and saw the handle of a pistol in his hand. He told him that the pistol would get him into trouble, and he answered that he usually carried one.

Mrs. Sauer was the first witness for the defense. She testified that she went to the deceased's house on October 21, while the deceased was suffering from his wound, and cleaned up his room. The bed had not been occupied, and she noticed no blood. She saw a pocket knife with double blades about three inches long, lying on the bed. The deceased inquired about it the next day, and she informed him that she had found it.

Martha Lindsay, his mother, was the next and the most important witness introduced by the defendant. She testified that she lived on the place of the deceased at the time of the shooting, and had lived there for three years previous. She and her sons, Babe and the defendant, rented land from the deceased the first year, and she and Babe rented from him the second year. The first year they rented three pieces, and planted cotton, corn and grass. The defendant cut the grass and stacked it, and told the deceased that he could have it all, and to go and get it.

The deceased allowed the grass to remain in the field until it rotted. After the crop of the second year was gathered, he made a claim for the loss of the grass.

The deceased employed the defendant and Babe to build the house in which the witness lived, agreeing to pay them fifteen dollars for the work. Babe got his seven and a half dollars, by getting Smith Mallow to sell his cotton, and take it out of the deceased's rent. The defendant did not get his pay. He brought the crop of cotton raised the second year, by the witness and Babe, to sell, and was about to sell it when the deceased interfered, and the two, deceased and defendant, got into a dispute about it, for which reason the cotton-buyer declined to purchase. Loss and George Perry and Crutchfield were present at this time. The defendant got on the wagon and started back with the cotton, saying that he would take it back to the gin and let it stay there if the deceased did not pay him. The deceased stopped him, and said he would pay him if he would let the cotton be sold. The defendant told the witness to get the bill for the cotton, but the purchaser gave it to the deceased. The witness got her money, but the defendant only got four dollars of the seven and a half which the deceased owed him. The deceased promised to pay it all, but did not do it. He made some claim about cattle eating up the defendant's corn.

The witness was at home when the shooting occurred, having returned there from church with the defendant, Babe, and Jim Mayberry. She did not know where the defendant was going when he left the house in the afternoon, but supposed his destination was the "spring." Some time after he left, Babe and Frank House told the witness that something had happened at the house of deceased. She sent Babe and Frank to the house, and followed shortly afterwards. Frank was there when she arrived, but Babe had gone for Mr. Mallow. The deceased

was sitting in a chair, out in the yard, south from the house, with a camphor bottle in his hand. He said that he believed that he was going to die. The witness saw that he was sliding out of his chair, caught him and took him into the house and put him to bed. He tried to get up, but the witness pushed him back in bed, and did so the second time before he would remain quiet.

The house of the deceased was a double log house with a partition in the middle, with a double chimney in the partition, and a shed room on the north side of the house, extending its entire length. There were two doors in each of the main rooms, one leading out into the yard on the south, and one leading into the shed room, which was the kitchen. There was but one door to the outside in the shed room, and it was opposite the door in the east room, and there was no door in the partition between the two rooms. The witness saw litter as of whittling where the chair was sitting. The first blood that she found was one or two feet from the door on the outside of the house. She followed the trail of the blood from there into the west room, and through that, by and near the bed, on into the shed room, and through and out of that around to the southeast of the house where the deceased was sitting when she found him. "Uncle" Dennis was the first person who reached the house after the witness got there; Townsend next, and Mallow next. The witness remained there that night until after the doctor left, returned next morning, and was there every day afterwards until death ensued, except Thursday. Most blood was found where the deceased was sitting in the yard. The bed in the west room was not used at all.

Cross-examined, the witness stated that there was no blood in the east room at all. The witness had washed all the blood from the person of the deceased before Dr. Sims arrived. There was no gate between the enclosures of the deceased and the witness, but there was one leading

out of his enclosure southwest from the house. The witness, Martha Hodges and Judy House were the only women present when Dr. Sims arrived. The deceased claimed that the defendant owed him for letting the grass rot, of which there was about one and a half acres. The defendant had no interest in the last year's crop.

Re-examined, the witness stated that the defendant cut and shocked the grass about which the claim was made. He went to the deceased and told him to take it off. He had not contracted to deliver it to the deceased. The deceased did not get out of bed after the witness pushed him back the second time, until after Mr. Mallow arrived.

B. W. Rhine testified for the defendant that he knew about the cotton transaction between defendant and deceased, which occurred on November 3, 1880. The witness had the handling of the money for which the cotton was sold. He gave to the defendant's mother the amount due her, and retained the amount of the rent which the deceased claimed from the defendant. The defendant denied the debt and claimed the money. The witness told the defendant that he, witness, had better retain the money until the parties got the controversy settled. He kept the money until some time during the next summer, when he asked the deceased what he should do with it, and was directed by the deceased to apply it to the debt due by him to the witness. On November 3, 1880, the day of the cotton transaction, the deceased entered the witness's store and told him that defendant had some cotton out there for sale, and was owing him, and asked witness to get it for what he, deceased, owed witness, and witness got hold of the ticket.

Cross-examined, he said that the defendant was dissatisfied about leaving the matter to arbitration, and several times called on him for the money. The deceased paid the defendant all he owed him but three dollars.

Chas. Chapman testified that he heard the difference between the deceased and the defendant about the cotton, as spoken of by the last witness. The defendant claimed that the deceased owed him, and said that he would do nothing about the cotton until paid. The defendant, on that occasion, said to the deceased: "Mr. Norval, you promised me that you would pay me, and I want you to pay me." Old man Adam and Henry Crutchfield were present. The talk lasted some five minutes, when Mr. Rhine came up, and seemed to settle the controversy.

Nothing additional was developed by the examination of the remaining witnesses.

*Throckmorton, Brown & Bro., M. H. Garnett, K. R. Craig* and *R. De Armand*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

HURT, J. The appellant was indicted for the murder of W. R. Norval, and was tried and found guilty of murder of the first degree, the jury assessing the death penalty.

Counsel for appellant insist that the judgment should be reversed because the declarations of the deceased were admitted in evidence. The record fails to show that the defendant objected to the introduction of these dying declarations. There is no bill of exceptions, nor does an objection appear in any part of the record, save in the motion for a new trial.

Article 640 of the Code of Criminal Procedure requires that each juror shall be tried and passed upon separately; and article 642 provides that, "as each juror is selected for the trial of the case, the following oath shall be administered to him by the court or under its direction," etc. The oath must be administered to each juror as selected. This was not done in this case. After twelve jurors had been selected, the proper oath was adminis-

tered to them in a body. Of this proceeding, we learn for the first time in the motion for a new trial. There was no request made by the defendant to have the jurors sworn as selected, nor did the defendant object to their being sworn in a body. The first complaint is heard in the motion for new trial, and in his motion he does not state that he was not aware of these proceedings at the time they were had. These irregularities are now urged here as a ground for reversal. We are of the opinion that they come too late. If the defendant had demanded that the jurors be sworn as selected, and this demand had been refused, we would have been compelled to reverse the judgment. If an objection to their being sworn in a body had been interposed, a very nice question would be presented for our decision; but the defendant did neither.

The question presented is this: Will this court reverse a judgment for these irregularities, when the defendant made no objection at the time, taking his chance of being acquitted by this jury thus sworn, and holding in reserve this matter to be used in his motion for new trial, and, on failure then, to be used in this court as ground for reversal of the judgment? We think not.

In Buie's case, 1 Texas Ct. App. 452, the defendant moved for a new trial upon the ground that the persons impaneled to try him, and who did try him, were not the regular jury summoned for the term, and because none of the regular jury were first called or challenged, and because there is no authority under the law for him to be tried by any except the regular jury, unless the regular jury had been called and challenged." The court say in that case: "The objection, in view of these facts, is not tenable. Defendant did not, it appears, challenge either the array or the particular jurors, . . . but accepted the jury as summoned. He by this course waived any right he might have had, and cannot now be heard to complain. Nor could such an error, if such it was, be

reached by motion for new trial. The only grounds for new trial in a felony case are those enumerated in the statute."

In Hasselmeyer's case, 1 Texas Ct. App. 690, the accused moved in arrest of judgment on the ground that the names of the jurors were not drawn by the clerk as required by the jury law, but were drawn by the judge. *Held*, that the objection should have been made by challenge to the jury when impaneled, and is not available in arrest, or for new trial. See also *Yanez* v. *State*, 6 Texas Ct. App. 429; *Reed* v. *State*, 1 Texas Ct. App. 1; *Bowman* v. *State*, 41 Texas, 417. We think the principles enunciated in the above cases apply with equal force to this case.

One James Mayberry was indicted in a separate bill for this same murder. After the trial and conviction of the appellant, the State entered a *nolle prosequi* in the case against James Mayberry. The appellant, Caldwell, in his motion for new trial, relied, among other things, upon the affidavit of Mayberry, which is to this effect: "That about twenty or thirty minutes after the shooting, the witness met the defendant about one-half mile from the place of the homicide, and that the defendant told the witness that he, defendant, had broken the law, that he would not have done so if Mr. Norval had not cut at him with a knife three times." The facts immediately attending the killing are not of that character as would make this statement of witness competent evidence. The State did not rely upon circumstantial evidence to prove that defendant killed Norval, but, on the contrary, this was shown by positive evidence, describing the homicide minutely. And when the facts which immediately attended the homicide are looked to, there is not the slightest probability of the truth of the statement of the defendant. While the writer is of the opinion that, under a certain state of case, these statements may be admissible, though

made at the time and distance from the homicide that these were made, this is only the opinion of the writer, and must not be construed as that of this court.   See West's case, 7 Texas Ct. App. 150.

We have examined the evidence most carefully, holding in view the awful consequences, and have been unable to come to any other conclusion than that reached by the jury.   That the appellant killed the deceased Norval, and with express malice, there can be no doubt, if it be possible for evidence to place this issue beyond doubt.   Looking at the whole record, and being aware of the great ability and skill of the learned counsel who defended this unfortunate man, we are thoroughly satisfied that he had a fair trial.

There remains to us, therefore, the imperative duty of affirming the judgment, which is accordingly done.   The judgment is affirmed.

*Affirmed.*